I'm Kathleen Lawyer and I represent the appellants in this case. I think that this is an important case for the disabled children within the Ninth Circuit. This is especially true in light of E. Drew v. Douglas, that's currently before the Supreme Court, where they're deciding whether they will increase the Meaningful Benefit Standard. And the expectation is that the Supreme Court is going to do that, especially after the Justice Department's amicus brief suggesting how it should be done. And the increase in the Meaningful Benefit Standard would require a provision of education of meaningful benefit that is meaningful as to the student's capabilities. And as even the ALJ in the lower administrative hearing said in this case, the crux of the case is the determination of E.F.'s cognitive ability. Our position has always been that the testing that the district did wasn't valid. And it wasn't valid because of his non-verbal status as a child with severe speech and language deficits and autism. And so... There's a great deal of love, care, and involvement with the welfare of their children. So I agree with you that this is an important case. But what I think is really at issue here is that the school district, as you properly say, did certain things that your client doesn't feel satisfied with. The administrative officer looked at all those things extensively. I don't think anybody could argue that the hearing and the review was insufficient. Issued a 61-page order that effectively granted relief on the one ground of the five sessions that the young child was ultimately given. And the district court looked at that and said as a matter of administrative law, he couldn't overrule or find any substantive wrongs with what the school district did. Or the administrative officer. Now, you may disagree with that. And I understand that the parents in a case like this or any similar case would want more and perhaps disagree with it. But we're simply limited to looking at what the district court did and whether his review was proper. And it seems like he did the best he could, right? Well, your honor, I would respectfully disagree. Maybe the best he could is a fair statement. But that's exactly what our argument has been from the start. This is a complex situation. We brought a world-renowned expert in who completely, her testimony was ignored. Well, ignored or found to be wanting in terms of persuasiveness, I'm not sure competency is the right word, but it almost amounts to a credibility determination or sort of a classic battle of the experts that we frequently see on appeal. And we really do have to give some substantial deference to the fact finder who listens to the witnesses and in this case articulates a reason why the hearing officer did not find, is it Dr. Murphy's? Hughes. Hughes, I'm sorry. Dr. Hughes' testimony to be as persuasive as you had hoped to convince the fact finder. Well, your honor, to address that issue, we presented evidence that was the product of the district. The initial testing that they did on EF, his IQ score was assigned a standard score of 79, which is basically one point below the cutoff of average. And even in that because they could not complete all the protocols. And that was because of the severe autism and the lack of communication. And the nonverbal aspects. He had no language. He had no functional language at all. And then when they decided to do their early triennial and the parents agreed, the parents were always very cooperative with the team in trying to deal with the situation, the assessor at that time only administered one subset, one subtest, and came up with below 50. And bam, now he was intellectually impaired. And the problem with that... The problem comes, and I don't know whether you're really addressing the question asked, because you're arguing, it seems to me, that the ALJ erroneously accepted the district's determinations. It seemed to me that on that issue we had Hughes, Cotier, maybe it's Cotier, I'm from Idaho, I don't know what it is, Cotier, and Selden. On the other hand, we had Kent, and we had deficiencies in what Hughes did. And the ALJ had to pick among one of the other. And what the ALJ said was, I'm not going with Hughes. Why? Hughes didn't reference the student's cognitive testing ability. He didn't review Kent's assessment before he testified. He didn't test the young man with cognitive testing, thus there were no contrary results in his testability. He didn't even review Dr. Kent's report. He didn't do any cognitive testing that he would call the report into question. So therefore, I'm not going to accept Hughes. That's what the ALJ said. He said, I'm instead going to accept Kent. His assessments were accurate. The results were corroborated by the prior testing. And he got to Cotier, and he says, Cotier helps the district, right there. What she says, the student, or what Cotier says, I can't remember if it's a lady right now, the student's limited tolerance for frustration could decrease the feasibility of student using an argumentative communication system functionally. And therefore, he says, okay, I got an ALJ, I got to look at Kent, I got to look at Hughes, I got to look at Cotier. And when you come to me, I have to give deference to this. How do I not give deference to all of that? But, Your Honor, Cotier was speaking to frustration, not cognition in that statement. Frustration- That's your argument. Okay, so- But I've got the ALJ who's now trying to fashion an opinion and decide what to do, and I've got to give some deference to him. They're all ladies, by the way, Your Honor. Pardon? They're all ladies. Okay, to her. And I say to myself, how can I say she's just out to lunch, that I don't give any deference to it? And I think that's what Judge Tallman's question is. We've got to look at this, and we've got to give standards of review, and we've got to give deference where we do. And if they're stating it out there, why they did what they did, how can I just, on appeal, just because I want to, go like this? Well, Your Honor, I understand what you're saying as far as deference to the ALJs. However, going back to Dr. Hughes, she was on the stand for seven hours, and she stood up pretty well. And there's tape recordings, if we had to prove that up by submitting additional evidence. The problem goes back to the capability question. And the totality of the evidence presented paints a picture of this young man and how impacting his disabilities were on his ability to demonstrate his knowledge and his capability. But counsel, I'm not sure you were listening to Judge Smith. I think what he was suggesting to you is the fact finder had before, in the record, 16 witnesses, 100 and some odd exhibits, seven days of hearing. And the ALJ explained why Dr. Hughes' testimony was less persuasive. And it basically goes to the basis for her opinions, what she failed to do, what she should have done, in comparison to the testimony that the fact finder heard from the school district's witnesses, which were, in the judgment of the fact finder, more on point to the issue that the fact finder needed to resolve. We can't retry that case here on appeal. We don't have the opportunity to look at the witnesses or hear how they testified. And you've got a pretty tough uphill battle to convince us that the ultimate determination by the fact finder to give less weight to this testimony was clear error. Your Honor, I think it was clear error. Obviously, I've argued that throughout my pleadings. I also think it was an abuse of discretion. With the idea that currently... But we're not talking about, it's not abuse of discretion. We're talking about basic credibility determinations by the finder of fact. And there's case law that says that those determinations are virtually unreviewable on appeal. But, Your Honor, how do you make right the situation that even the district witnesses who did the IQ testing stated that those numbers were not reliable? So how do you make a hardcore decision on a child's cognition and the program... We don't. I think the point that the other two judges are establishing is that the ALJ made those decisions and the district court affirmed those findings. And according to our court, an administrative hearing officer who, quote, receives live testimony is in the best position to determine issues of credibility, close quote. And therefore, we should afford particular deference to findings based on the determinations. Now, I understand you don't like the determinations. And if I were you, I wouldn't like them either. But we are on a second level of review where our powers are highly limited. Agree? Well, I understand what you're saying, and I agree that you have limitations. But I also understand that you have discretion to make a decision beyond... Let me ask you a question because your time is running down. What was wrong with the district judge ordering a summary judgment motion early after he affirmed the ALJ on appeal and ordered summary judgment motions prior to the close of discovery? What was wrong with that? I felt it was... You felt it was premature. Premature because of the discovery extension that we had and... Well, you agreed to that, but the district court said, I've got all the information I need. We've got a 61-page report. The claims that are filed, of which only five were remaining, have effectively been, why put your clients, why put the school district through more expense in accumulating discovery that's not going to change anything? Why don't we hear legal argument? And at the time you filed the summary judgment response, you could have suggested, in fact, did suggest what additional discovery was necessary. But, I mean, it's not out of process for judicial economy to say, okay, we're at the end of the line with this thing. Let's see where we're at legally, and if anything remains, we can go to trial. I have to say I don't think that the district judge did anything out of process there. Well, Your Honor, I think the bigger issue was the failure of the judge to allow an amended complaint. We hadn't filed even our first amended complaint yet. Did you ever ask? Yes, we did. Yes, we did. When? We asked first when the order came up. I mean, I ask you the question because I wanted you to narrow in. When did you ask? We asked when the motion, we made a motion. At the proper time to ask. Focus on that after you talk about when did you ask. Well, Your Honor, I guess I relied on the federal rules of civil procedure that, especially the new revision to the rule that governs amendments to complaints. And based on the comments to that rule and the practice to that rule, is it's absolutely customary for even a motion for summary judgment to grant it in full with leave to amend, especially when part of the reason the motion was granted was because of the feeling of the district, as well as the judge, that we came up with a new theory. Well, one of the odd procedural aspects of these appeals is that unlike a typical lawsuit where a complaint is filed and discovery is conducted, here the district court is sitting as a court of review of an administrative determination based on a 2,700-page administrative record and what amounts to a seven-day trial and a 61-page judgment that the ALJ has rendered. It doesn't seem to me, as Judge Murphy was suggesting, improper at all for the district court in this kind of a case to say, I've got all the information I need based on the complaint that is pending before me. And at some point, the court does have the discretion to say, I'm not going to allow you to introduce new theories at this stage of the case. We're too far into the litigation. And it looks to me that that's what Judge Carney did here. Well, I think that that was a punitive result for my minor client. It's not punitive. The ADA aspect is still in play at that point. And so knowing that there was a theory out there that was a valid theory for that minor child, I just think that was an error in judgment. I've let you go over about six and a half minutes. Oh, I'm sorry. No, that's all right. We asked you lots of questions. Let's hear from the district. Good morning, Your Honors. Good morning. My name is Dan Harbottle, and I obviously represent the Newport Mesa Unified School District. I'm sure you'll have questions for me, but I wanted to start briefly by just a quick mention of the Andrew F. case that was argued recently. What struck me about the argument there and the briefs was that I believe this underlying ALJ did precisely what the Supreme Court, if it changes the rule as far as what the standard of review will be or the standard of necessary progress, it would be essentially what this ALJ did. She addressed the level of progress represented in the record, compared it to the student's level of functioning in all areas. And by the way, it isn't just cognition that was weak with EF. And she determined, after a review of the entire record, et cetera, that the progress that was demonstrated through the record was commensurate with his then current abilities, and therefore the progress was meaningful pursuant to the then rally standard, which will probably be slightly tweaked with the Andrew standard that will be some time to come. I also think it's important to remember that on top of what Your Honor said with respect to being the second level of appellate review, ALJs working with the Office of Administrative Hearings are assigned to specific areas. There are some assigned to general education matters. There are some assigned to special education matters. There are some assigned to other administrative matters. So we've got a specialist here on IDEA issues. Right, who has probably heard, well, I would say fair to say dozens and dozens of these cases, and is, in my opinion, well known for being careful and articulate, and I think this decision is a very good example of that. And, you know, we didn't agree with everything either in her outcome. We thought that Dr. Murphy, our joint SLP and BCBA, had been persuasive in her opinion that EF was not at the moment in February 2012 ready to progress to a video and assistive technology, a high-tech assistive technology. But that's not reversible error. That's just a disagreement on the base of the record, on the face of the record, and we didn't appeal that particular point. With respect to the summary judgment and the last round of discussion, I think it was precisely fair because this new theory was there available since the KM decision that had been a couple years earlier, at least a year earlier, and so it was available to plaintiffs to plead if they thought it was going to fit their record. And there were some modifications to the complaint. There weren't any amendments, but there were at least two and maybe three rounds of rule 7, central district rule 7-3 modifications to the complaint via meet and confer with counsel. So by the time we got to phase 1, the IDEA appeal argument, the case had been pared down from maybe, I think, 15, 12 to 15 causes of action, to the five that remained, the three causes, the three state and the two federal. So at that point, I think the court rightly felt that the parties had come to an agreement about what the parameters of the complaint would be before it and felt that it had, pursuant to the seven days of trial, a fully developed record as to all of the potential claims. Another, I think, relevant point on the potential for a new claim is that both Judge Lefkowski at the administrative level and Judge Carney at the district court level addressed what would happen were an amendment to be permitted and looked carefully at Dr. Murphy's analysis at the time. I'm sorry, Dr. Murphy, our expert. Oh, you're Dr. Murphy. That's right. Our guy. What she said was. I'm sensitive about that. Yeah, there's a lot of doctors in this case. Well, there's a lot of Murphys. There's a lot of Murphys. Right, that's true. That's true. Dr. Murphy gave an opinion that the ALJ didn't find determinative on the IDEA piece of the case. But that opinion was rational. It was based on very high professional qualifications. And even if an effective communication amendment had been permitted to the ADA in 504, would have been an ADA amendment, that would not have risen to the level of liability, according to Judge Carney, rightly, because under the law there isn't an ADA violation for effective communication or anything else on disability discrimination grounds, which is what the ADA in 504 would be, if there's a rational explanation for the district's public agency's action. Here he found that there was a rational explanation for her determination, however inappropriate it was according to the ALJ under the IDEA, but it didn't amount to deliberate indifference, which is what would have had to be proven. So I think judicial economy is the right answer, that even had an amendment been permitted, there wouldn't have been any modification to the outcome. Well, you've hit the issue that I was going to ask you about. The ALJ did find that the district should have assessed the student earlier than the spring of 2013, and assistive technology should have provided him with electronic assistance technology device, and gave damages. Correct. And the big question that counsel really brings to the point is, why isn't that an ADA violation? Because it's an IDEA violation, not an ADA violation. We're not talking about IDEA, we're talking about ADA. Right. There's 504 and IDEA, I understand that, but now we're at ADA. Okay. And with the ADA, the plaintiff must show that there's an individual with a disability, denied reasonable accommodation, program providing the benefit, receives federal assistance. Right. Seems like those are met. Yes, but not the key element, which is that there was discrimination on the basis of disability. Both the 504 and ADA require specifically, especially if you're seeking damages, which is what was at issue here, that there be a finding of fact that the action taken by the district was solely based, in the case of 504 and based, resulted in or resulted by a disability discrimination, not only just in fact, but intentionally. The fact that you're saying that since the ALJ never spoke to that, there was no such finding that would support liability under the ADA. It went even farther than that. It went to the point. Well, no. That's true. Right. It went further, though, because there were, in fact, findings with respect to Dr. Murphy, for example, the district's speech path and BCBA, duly qualified, that if there is a rational explanation, which there was pursuant to Dr. Murphy's opinion, then there is, per se, no deliberate indifference under the ADA or 504. So a violation of the IDEA does not, per se, translate into an ADA violation. And if there is evidence, as there was here, of an alternative explanation, as opposed to disability discrimination, then there is no ADA or 504 violation. Maybe we could phrase it differently to say an IDEA violation does not translate into an ADA violation unless there is a specific factual finding of disability. And in this case, there was not only that, but there are these other factors you just mentioned. Disability discrimination. All right. We're talking about disability discrimination, right? Correct. And even with disability discrimination, we'd have to have intentional and deliberate indifference, right? Correct. What we had here is school district folks who, according to the ALJ, ought to have done what they ultimately did do about 10 months earlier. You got them the devices and paid the damages, right? Right. We had actually gotten him the device before the decision came out, if I remember the chronology right. But by the time that we got him the device, about 10 months had passed since they had asked for it. I have no other questions. I don't have anything else unless you'd like something further. Power bottle. Thank you very much. Okay. I'll give you a couple minutes so you can have the last word. I'd like to address the last thing that you discussed, that IDEA does not translate to ADA claim. Well, under the new amendments, it certainly isn't necessary. In the KM case that was decided, it said- I think before you address that, you need to address very specifically what Judge Murphy asked, which is, did the ALJ even find any discrimination? That's not what her test was. Well, that's what you got to prove for an ADA claim. But I'm saying you don't need the ALJ. And then if the ALJ did not even determine that, the second part is, under Paradise Valley, you've got to show deliberate indifference. What is there about any of this that is deliberately indifferent? Well, the case law supports the concept that the district should know, knew or should have known, is part of that standard to prove. But that's negligence. That's not deliberate indifference. But it translates into, if they reasonably could foresee the damage it would cause, that's the criteria. And with the district touting these people as being such great experts, how could someone as experienced as her resume would lead you to believe, like Dr. Murphy, not understand that he was untestable cognitively and the impact his not having any functional communication had on his ability to access his education? And so I just don't think they can have it both ways. But if her testimony was, based on all of that, we just didn't think that he was ready yet for an AT device, how does that establish deliberate indifference? Your Honor, if they had tested him and then said he wasn't ready, that would be valid. Counsel, it's a catch-22 situation. Part of the problem with the testing is the physical and cognitive abilities of the student, which, as you mentioned earlier, made it very difficult to test. But, Your Honor, testing AT devices is not sitting him down and giving him a protocol that he has to respond to whether he can read or identify letters or all that that's involved. It's putting the machine in front of him, which finally the parents did. They got him an iPad and, bam, he started using it. Okay. Okay. All right. And they testified to that. Your time has expired. Thank you, Your Honor. Thank you very much. The case just argued is submitted and we'll get you an answer as soon as we can.
judges: Tallman, N.R. Smith, Murphy